**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS; PESTICIDE ACTION NETWORK NORTH AMERICA; NATURAL RESOURCES DEFENSE COUNCIL; CALIFORNIA RURAL LEGAL ASSISTANCE FOUNDATION; FARMWORKERS ASSOCIATION OF FLORIDA; FARMWORKER JUSTICE GREENLATINOS; LABOR COUNCIL FOR LATIN AMERICAN ADVANCEMENT; LEARNING DISABILITIES ASSOCIATION OF AMERICA; NATIONAL HISPANIC MEDICAL ASSOCIATION; PINEROS Y CAMPESINOS UNIDOS DEL NOROESTE; UNITED FARM WORKERS, *Petitioners*, | No. 17-71636<br><br>OPINION |

STATE OF NEW YORK; STATE OF MARYLAND; STATE OF VERMONT; STATE OF WASHINGTON; COMMONWEALTH OF MASSACHUSETTS; DISTRICT OF COLUMBIA; STATE OF CALIFORNIA; STATE OF HAWAII,
                    *Intervenors*,

v.

ANDREW WHEELER, Acting
Administrator of the U.S.
Environmental Protection Agency;
and U.S. ENVIRONMENTAL
PROTECTION AGENCY,

*Respondents.*

On Petition for Review of an Order of the
Environmental Protection Agency

Argued and Submitted July 9, 2018
Seattle, Washington

Filed August 9, 2018

Before:  Ferdinand F. Fernandez and Jacqueline H.
Nguyen, Circuit Judges, and Jed S. Rakoff,[*] District Judge.

Opinion by Judge Rakoff;
Dissent by Judge Fernandez

---

[*] The Honorable Jed S. Rakoff, United States District Judge for the
Southern District of New York, sitting by designation.

## SUMMARY**

### Pesticides

The panel granted a petition for review, and vacated the Environmental Protection Agency's ("EPA") 2017 order maintaining a tolerance for the pesticide chlorpyrifos, and remanded to the EPA with directions to revoke all tolerances and cancel all registrations for chlorpyrifos within 60 days.

The Federal Food, Drug, and Cosmetic Act ("FFDCA") authorizes the EPA to regulate the use of pesticides on foods according to specific statutory standards, and grants the EPA a limited authority to establish tolerances for pesticides meeting statutory qualifications.  The EPA is subject to safety standards in exercising its authority to register pesticides under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA").

The EPA argued that FFDCA's section 346a(g)(2)'s administrative process deprived this Court of jurisdiction until the EPA issues a response to petitioner's administrative objections under section 346a(g)(2)(C), which it has not done to date.

The panel held that section 346a(h)(1) of the FFDCA does not "clearly state" that  obtaining a section (g)(2)(C) order in response to administrative objections is a jurisdictional requirement.  The panel held that section 346a(h)(1) contains no jurisdictional label, is structured as a

---

** This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

limitation on the parties rather than the court, and only references an exhaustion process that is outlined in a separate section of the statute.

The panel held that in light of the strong individual interests against requiring exhaustion and weak institutional interests in favor of it, petitioners need not exhaust their administrative objections and were not precluded from raising issues on the merits.

Turning to the merits, the panel held that there was no justification for the EPA's decision in its 2017 order to maintain a tolerance for chlorpyrifos in the face of scientific evidence that its residue on food causes neurodevelopmental damage to children. The panel further held that the EPA cannot refuse to act because of possible contradiction in the future by evidence. The panel held that the EPA was in direct contravention of the FFDCA and FIFRA.

Judge Fernandez dissented. Judge Fernandez would hold that there is no jurisdiction over the petition for review under FFDCA and FIFRA, and dismiss the petition.

**COUNSEL**

Patti A. Goldman (argued), Marisa C. Ordonia, and Kristen L. Boyles, Earthjustice, Seattle, Washington, for Petitioners.

Frederick A. Brodie (argued), Assistant Solicitor General; Andrea Oser, Deputy Solicitor General; Barbara D. Underwood, Attorney General; Office of the Attorney General, Albany, New York; Brian E. Frosh, Attorney General; Steven M. Sullivan, Solicitor General; Office of the Attorney General, Baltimore, Maryland; Thomas J. Donovan Jr., Attorney General; Nicholas F. Persampieri, Assistant Attorney General; Office of the Attorney General, Montpelier, Vermont; Robert W. Ferguson, Attorney General; William R. Sherman, Counsel for Environmental Protection; Attorney General's Office, Seattle, Washington; Maura Healey, Attorney General; I. Andrew Goldberg, Assistant Attorney General; Environmental Protection Division, Office of the Attorney General, Boston, Massachusetts; Karl A. Racine, Attorney General; Brian R. Caldwell, Assistant Attorney General; Office of the Attorney General, Washington, D.C.; Xavier Becerra, Attorney General; Susan S. Fiering, Supervising Deputy Attorney General; Reed Sato, Deputy Attorney General; Office of the Attorney General, Sacramento, California; Russell A. Suzuki, Acting Attorney General; Wade H. Hargrove III, Deputy Attorney General; Health and Human Services Division, Department of the Attorney General, Honolulu, Hawaii; for Intervenors.

Phillip R. Dupré (argued) and Erica M. Zilioli, Attorneys, Environmental Defense Section; Jeffrey H. Wood, Acting Assistant Attorney General; Environment and Natural Resources Division, United States Department of Justice, Washington, D.C.; Mark Dyner, Office of the General

Counsel, United States Environmental Protection Agency, Washington, D.C.; for Respondents.

Donald C. McLean, Stanley H. Abramson, Kathleen R. Heilman, and Sylvia G. Costelloe, Arent Fox LLP, Washington, D.C., for Amicus Curiae Dow Agrosciences LLC.

Susan J. Kraham and Edward Lloyd, Columbia Environmental Clinic, Morningside Heights Legal Services, New York, New York, for Amicus Curiae Congressman Henry Waxman.

Shaun A. Goho, Emmett Environmental Law & Policy Clinic, Harvard Law School, Cambridge, Massachusetts, for Amici Curiae Health Professional Organizations.

**OPINION**

RAKOFF, District Judge:

Over nearly two decades, the U.S. Environmental Protection Agency ("EPA") has documented the likely adverse effects of foods containing the residue of the pesticide chlorpyrifos on the physical and mental development of American infants and children, often lasting into adulthood. In such circumstances, federal law commands that the EPA ban such a pesticide from use on food products unless "there is a reasonable certainty that no harm will result from aggregate exposure to the pesticide." 21 U.S.C. § 346a(b)(2)(A)(ii). Yet, over the past decade and more, the EPA has stalled on banning chlorpyrifos, first by largely ignoring a petition properly filed pursuant to law seeking such a ban, then by temporizing in response to repeated orders by this Court to respond to the petition, and, finally, in its latest tactic, by denying outright our jurisdiction to review the ultimate denial of the petition, even while offering no defense on the merits. If Congress's statutory mandates are to mean anything, the time has come to put a stop to this patent evasion.

Petitioners seek review of an EPA order issued March 29, 2017 (the "2017 Order" or "Order") that denied a 2007 petition to revoke "tolerances," i.e. limited allowances, for the use of chlorpyrifos on food products. Petitioners argue that the EPA does not have the authority to maintain the tolerances for chlorpyrifos under the Federal Food, Drug, and Cosmetic Act ("FFDCA"), which authorizes the EPA to "leave in effect a tolerance for a pesticide chemical residue in or on a food only if the Administrator determines that the tolerance is safe"—with "safe," in turn, defined to mean that the EPA "has determined that there is a reasonable certainty that no harm will result from aggregate exposure to the

pesticide chemical residue." 21 U.S.C. § 346a(b)(2)(A)(i)–(ii). Respondent, the EPA, has never made any such determination and, indeed, has itself long questioned the safety of permitting chlorpyrifos to be used within the allowed tolerances. The EPA, therefore, does not defend the 2017 Order on the merits. Instead, the EPA argues that, despite petitioners having properly-filed administrative objections to the 2017 Order more than a year ago, and despite the statutory requirement that the EPA respond to such objections "as soon as practicable," the EPA's utter failure to respond to the objections deprives us of jurisdiction to adjudicate whether the EPA exceeded its statutory authority in refusing to ban use of chlorpyrifos on food products.

We hold that obtaining a response to objections before seeking review by this Court is a claim-processing rule that does not restrict federal jurisdiction, and that can, and here should, be excused. There being no other reason not to do so, we grant the petition on the merits.

## BACKGROUND

A. *The Statutory Framework*

The FFDCA authorizes the EPA to regulate the use of pesticides on foods according to specific statutory criteria. 21 U.S.C. §§ 301–399i. The FFDCA prescribes that food with "any pesticide chemical residue . . . shall be deemed unsafe" and barred from movement in interstate commerce. *Id.* § 346a(a)(1). However, it grants the EPA a limited authority to establish tolerances for pesticides meeting statutory qualifications, enabling foods bearing residues of those pesticides within these tolerances to move in interstate commerce. *See id.* § 346a(a), (a)(4), (b)(1).

The EPA's ability to establish tolerances depends on a safety finding. "The Administrator may establish or leave in effect a tolerance . . . only if the Administrator determines that the tolerance is safe." *Id.* § 346a(b)(2)(A)(i). A tolerance qualifies as safe if "the Administrator has determined that there is a *reasonable certainty* that *no* harm will result from aggregate exposure to the pesticide chemical residue, including all anticipated dietary exposures and all other exposures for which there is reliable information." *Id.* § 346a(b)(2)(A)(ii) (emphasis added). To make such a determination, the EPA must perform a safety analysis to "ensure that there is a reasonable certainty that no harm will result to infants and children from aggregate exposure" and "publish a specific determination regarding the safety of the pesticide chemical residue for infants and children. *Id.* § 346(b)(2)(C)(ii)(I)–(II). Furthermore, even after establishing a tolerance, the EPA bears continuous responsibility to ensure that the tolerance continues to satisfy the FFDCA's safety standard; the FFDCA provides that the Administrator may "leave in effect a tolerance . . . only if the Administrator determines that the tolerance is safe" and "shall modify or revoke a tolerance if the Administrator determines it is not safe." *Id.* § 346a(b)(2)(A)(i).

The EPA is subject to these same safety standards in exercising its authority to register pesticides under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"). *See* 7 U.S.C. § 136a(a). The EPA Administrator must register a pesticide—which is a requirement for pesticides to be distributed or sold—when, among other qualifications, the pesticide does not have "unreasonable adverse effects on the environment." *Id.* § 136a(c)(5) (D). FIFRA incorporates the FFDCA's safety standard into the definition of "unreasonable adverse effects" to include "a human dietary risk from residues that result from a use of a

pesticide in or on any food inconsistent with the standard under [the FFDCA]." *Id.* § 136(bb). FIFRA requires the EPA to reevaluate pesticides periodically after approval. *Id.*

While the EPA can act on its own initiative to establish, modify or revoke a tolerance under the FFDCA, 21 U.S.C. § 346a(e)(1), "[a]ny person may file . . . a petition proposing the issuance of [such] a regulation." *Id.* § 346a(d)(1). After "due consideration," the EPA Administrator must issue either a proposed or final regulation or an order denying the petition. *Id.* § 346a(d)(4)(A). After this response, "any person may file objections thereto with the Administrator." *Id.* § 346a(g)(2)(A). The FFDCA directs that the Administrator "shall issue an order [known as a "g(2)(C) order"] stating the action taken upon each . . . objection" "[a]s soon as practicable." *Id.* § 346a(g)(2)(C). "[A]ny person who will be adversely affected" by that order or the underlying regulation "may obtain judicial review by filing in the United States Court of Appeals" a petition for review. *Id.* § 346a(h)(1).

B.  *The History of this Litigation*

This case arises from a 2007 petition filed under 21 U.S.C. § 346a(d) proposing that the EPA revoke tolerances for the pesticide chlorpyrifos (the "2007 Petition" or the "Petition"). Chlorpyrifos, an organophosphate pesticide initially developed as a nerve gas during World War II, was approved in 1965 in the United States as a pesticide for agricultural, residential, and commercial purposes. Chlorpyrifos kills insects by suppressing acetelycholinestrerase, an enzyme that acts as a neurotransmitter in various organisms, including humans. The EPA has set chlorpyrifos residue tolerances for 80 food crops, including fruits, nuts, and vegetables. *See* 40 C.F.R. § 180.342. The 2007 Petition, filed by the Pesticide Action

Network North America ("PANNA") and the Natural Resources Defense Council ("NRDC"), presented scientific studies showing that children and infants who had been exposed prenatally to low doses of chlorpyrifos suffer harms such as reduced IQ, attention deficit disorders, and delayed motor development, that last into adulthood.

Prior to the Petition's filing, the EPA already had concerns about chlorpyrifos. After reviewing the registration for chlorpyrifos in 1998 under the amended FFDCA's heightened safety standards that required considering cumulative exposure and the specific risks to children, the EPA cancelled all residential uses. Although the EPA continued to allow the use of chlorpyrifos as a pesticide on food crops, *see* 40 C.F.R. § 180.342, it required that "risk mitigation measures" be implemented while a full reassessment of chlorpyrifos was undertaken, as continued usage of chlorpyrifos without additional precautions "would present risks inconsistent with FIFRA." EPA 738-R-01-007 "Interim Reregistration Eligibility Decision for Chlorpyrifos" (Feb. 2002)). This "interim reregistration" also announced future plans to reduce or revoke entirely chlorpyrifos tolerance levels for certain crops, citing "acute dietary risks" for "infants, all children, and nursing females." *Id*.

Despite these earlier expressions of concern, the EPA failed to take any decisive action in response to the 2007 Petition, notwithstanding that the EPA's own internal studies continued to document serious safety risks associated with chlorpyrifos use, particularly for children. A 2008 EPA Science Issue Paper, reviewing existing scientific studies, "preliminarily concluded that chlorpyrifos likely played a role" in low birth rate and delays in infant mental development observed in human cohort studies. A Science

Advisory Panel convened in 2008 concurred that chlorpyrifos exposures "can lead to neurochemical and behavioral alterations [in the young] that persist into adulthood." A Science Advisory Panel convened in 2011 found "persuasive" evidence "that there are enduring effects on the Central Nervous System . . . from chlorpyrifos exposure at or above 1.0 mg/kg," and that chlorpyrifos exposure is associated with adverse neurodevelopmental effects in children, including abnormal reflexes, pervasive development disorder, and attention and behavior problems.

Yet, even after all of these EPA studies, by 2012 the EPA still had not responded to the 2007 Petition. PANNA and NRDC thereupon petitioned this Court for a writ of mandamus to force the EPA to take action. We initially dismissed the mandamus petition, without prejudice to its renewal, based on the EPA's representation that it had a "concrete timeline for final agency action" to be taken on the 2007 Petition by February 2014. *In re PANNA*, 532 F. App'x 649, 651 (9th Cir. 2013). When the EPA failed to respond to the 2007 Petition by September 2014, PANNA and NRDC again petitioned for mandamus, which we granted, ordering the EPA to issue a final response on the 2007 Petition by October 2015. *In re PANNA*, 798 F.3d 809, 815 (9th Cir. 2015).[1] We found the EPA's delay in responding to the 2007 Petition "egregious," especially "[i]n view of [the] EPA's own assessment of the dangers to human health posed by this pesticide," noting that the EPA had recently "reported that chlorpyrifos poses such a significant threat to water supplies that a nationwide ban on the pesticide may be justified." *Id.* at 811, 814.

---

[1] Unless otherwise indicated, case quotations omit all internal quotation marks, alterations, footnotes, and citations.

Notwithstanding the deadline set by this Court, the EPA did not initially respond to the 2007 Petition until November 2015, when it issued a proposed rule revoking all tolerances for chlorpyrifos. Chlorpyrifos; Tolerance Revocations, 80 Fed. Reg. 69,080 (Nov. 6, 2015); *see* 21 U.S.C. § 346a(d)(4)(A)(ii). Describing the various scientific studies' "consistency of finding neurodevelopmental effects" as "striking," *id.* at 69,090, the EPA stated that it was "unable to conclude that the risk from aggregate exposure from the use of chlorpyrifos meets the safety standard of [21 U.S.C. § 346a(b)(2)(A)(i)]" *id.* at 69,080.

Yet the EPA still equivocated and delayed. Accordingly, in December 2015, we ordered the EPA "to take final action by December 30, 2016 on its proposed revocation rule." *In re PANNA*, 808 F.3d 402, 402 (9th Cir. 2015). In June 2016, the EPA requested a six-month extension to continue scientific analysis, a request we characterized as "another variation on a theme of partial reports, missed deadlines, and vague promises of future action that has been repeated for the past nine years." *In re PANNA*, 840 F.3d 1014, 1015 (9th Cir. 2016). We found that a six-month delay was "not justified" in light of the previous time extensions and the EPA's "continued failure to respond to the pressing health concerns presented by chlorpyrifos," but granted a three-month extension to March 2017. *Id.*

In the meantime, the EPA issued a 2016 Risk Assessment concluding that estimated dietary exposure to chlorpyrifos at existing tolerances exceeded what was acceptable for all population groups analyzed, with the highest risks for young children. The Risk Assessment found that scientific literature "as a whole provides evidence of long-lasting neurodevelopmental disorders" linked to chlorpyrifos exposure, with any remaining scientific

uncertainties insufficient to "undermine or reduce the confidence in the findings of the epidemiology studies." The EPA concluded that its analysis of chlorpyrifos "continues to indicate that the risk from the potential aggregate exposure does not meet the FFDCA safety standard" and that "expected residues of chlorpyrifos on most individual food crops exceed the 'reasonable certainty of no harm' safety standard." Chlorpyrifos; Tolerance Revocations; Notice of Data Availability and Request for Comment, 81 Fed. Reg. 81,049, 81,050 (Nov. 17, 2016).

Then, in the Order at issue in this case, the EPA reversed its position and denied the 2007 Petition on the merits, leaving chlorpyrifos tolerances in effect. Chlorpyrifos; Order Denying PANNA and NRDC's Petition To Revoke Tolerances, 82 Fed. Reg. 16,581 (Apr. 5, 2017). The Order did not refute the agency's previous scientific findings on chlorpyrifos or its conclusion that chlorpyrifos violated the FFDCA safety standard. Instead, the EPA stated that it would not revoke tolerances as "the science addressing neurodevelopmental effects remains unresolved." *Id.* at 16,583. The EPA stated that it would not complete "any associated tolerance revocation of chlorpyrifos without first attempting to come to a clearer scientific resolution," *id.*, and claimed to have "discretion to determine the schedule" for reviewing the existing chlorpyrifos tolerances as long as it completed the chlorpyrifos registration review by FIFRA's deadline of October 1, 2022, *id.* at 16,590.

PANNA and NRDC moved for further mandamus relief in this Court, arguing that the 2017 Order failed to respond adequately to the 2007 Petition. We denied their motion as premature because the EPA had "done what we ordered it to do," i.e. responded to the 2007 Petition, since the 2017 Order formally denied it. *In re PANNA*, 863 F.3d 1131, 1132 (9th

Cir. 2017). Petitioners then petitioned this Court for review of the 2017 Order. Petitioners concurrently filed objections in the EPA's administrative review process. Thereafter, we permitted several states that had also filed objections to the Order to intervene in this matter.

The EPA does not defend this suit on the merits, but argues that § 346a(g)(2)'s administrative process deprives this Court of jurisdiction until the EPA issues a response to petitioners' administrative objections, *see* § 346a(g)(2)(C), which it has not done to date.

## DISCUSSION

### A.  *Jurisdiction*

The term "jurisdiction" refers specifically to "a court's adjudicatory authority." *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 160 (2010). Therefore, "a rule should not be referred to as jurisdictional unless it governs a court's adjudicatory capacity, that is, its subject-matter or personal jurisdiction." *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 435 (2011). In other words, "jurisdictional statutes speak to the power of the court rather than to the rights or obligations of the parties." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 274 (1994).

The Supreme Court has emphasized the necessity of observing "the important distinctions between jurisdictional prescriptions and claim-processing rules." *Reed Elsevier*, 559 U.S. at 161. Claim-processing rules "seek to promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times." *Henderson*, 562 U.S. at 435. Claim-processing rules may be "important and mandatory," but, as they do not "govern[] a

court's adjudicatory capacity," they can be waived by the parties or the court. *Id.*

The Supreme Court has adopted a "bright line" test for determining when to classify statutory restrictions as jurisdictional. *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 516 (2006). A rule qualifies as jurisdictional only if "Congress has clearly stated that the rule is jurisdictional." *Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 153 (2013). "[A]bsent such a clear statement," the Supreme Court has cautioned, "courts should treat the restriction as nonjurisdictional in character," with the specific goal of "ward[ing] off profligate use of the term 'jurisdiction.'" *Id.* In considering whether Congress has spoken clearly, courts consider both the language of the statute and its "context, including . . . [past judicial] interpretation[s] of similar provisions." *Reed Elsevier*, 559 U.S. at 168.

"[T]hreshold requirements that claimants must complete, or exhaust, before filing a lawsuit" are typically "treated as nonjurisdictional." *Id.* at 166. Accordingly, "we have rarely found exhaustion statutes to be a jurisdictional bar." *McBride Cotton & Cattle Corp. v. Veneman*, 290 F.3d 973, 978 (9th Cir. 2002) (holding that requirement of "exhaust[ing] all administrative appeal procedures . . . before [a] person may bring an action in a court" was not jurisdictional); *see also Anderson v. Babbitt*, 230 F.3d 1158, 1162 (9th Cir. 2000) (same for provision that "[n]o decision which at the time of its rendition is subject to [administrative] appeal . . . shall be considered final so as to be agency action subject to judicial review"); *Rumbles v. Hill*, 182 F.3d 1064, 1067 (9th Cir. 1999) (same for provision that "[n]o action shall be brought . . . until such administrative remedies as are available are exhausted"),

*overruled on other grounds by Booth v. Churner*, 532 U.S. 731 (2001).

Section 346a(h)(1), the FFDCA's judicial review provision, provides:

> In a case of actual controversy as to the validity of any regulation issued under subsection (e)(1)(C), or any order issued under subsection (f)(1)(C) or (g)(2)(C), or any regulation that is the subject of such an order, any person who will be adversely affected by such order or regulation may obtain judicial review by filing in the United States Court of Appeals for the circuit wherein that person resides or has its principal place of business, or in the United States Court of Appeals for the District of Columbia Circuit, within 60 days after publication of such order or regulation, a petition praying that the order or regulation be set aside in whole or in part.

The (g)(2)(C) order referenced above is the order "stating the action taken upon each such objection and setting forth any revision to the regulation or prior order that the Administrator has found to be warranted," which the EPA must issue at the conclusion of the administrative objections process outlined in § 346a(g)(2). *Id.* § 346a(g)(2)(C).

We must consider whether § 346a(h)(1) "clearly states" that obtaining a (g)(2)(C) order in response to administrative objections is a jurisdictional requirement. It does not. Section 346a(h)(1) "is written as a restriction on the rights of plaintiffs to bring suit, rather than as a limitation on the power of the federal courts to hear the suit." *Payne v.*

*Peninsula Sch. Dist.*, 653 F.3d 863, 869 (9th Cir. 2011) (en banc). It delineates the process for a party to obtain judicial review, by filing suit in one of two venues within a specified time, not the adjudicatory capacity of those courts.

In *Henderson*, the Supreme Court evaluated a similarly structured provision, which provided that, "to obtain [judicial] review" of a final decision of the Board of Veterans' Appeals, "a person adversely affected . . . shall file a notice of appeal with the Court." 562 U.S. at 438. The Court found this language did "not suggest, much less provide clear evidence, that the provision was meant to carry jurisdictional consequences." *Id.*  Similarly, in *Payne*, we held that an exhaustion requirement providing that "before the filing of a civil action . . . , the [administrative] procedures . . . shall be exhausted" was not a jurisdictional limit on the courts, but a requirement for plaintiffs that could be waived. 653 F.3d at 867, 869. Like the provision evaluated in *Payne*, the focus of § 346a(h)(1) on the requirements for petitioners "strongly suggests that the restriction may be enforced by defendants but that the exhaustion requirement may be waived or forfeited." *Id.* at 869.

Further, § 346a(h)(1) "does not speak in jurisdictional terms or refer in any way to the jurisdiction of the [federal] courts." *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 394 (1982). The word "jurisdiction" never appears. The reference to the United States Courts of Appeals "simply clarifies that, when determining in which court of competent jurisdiction they will file their claim, . . . litigants have a choice of venue." *Merritt v. Countrywide Fin. Corp.*, 759 F.3d 1023, 1038 (9th Cir. 2012) (classifying provision that an action "may be brought in any United States district court, or in any other court of competent jurisdiction" as

non-jurisdictional claim-processing rule despite its being labeled "Jurisdiction of courts; limitations on actions").

Section 346a(h)(1) similarly lacks mandatory language with "jurisdictional import." *Auburn Reg'l Med. Ctr.*, 568 U.S. at 154. It merely provides that a person "*may* obtain judicial review." 21 U.S.C. § 346a(h)(1) (emphasis added). In *Auburn Regional Medical Center*, the Supreme Court evaluated a provision with similar language, which instructed that a health care provider "may obtain a hearing" by the Provider Reimbursement Review Board if "such provider files a request for a hearing within 180 days after notice of the intermediary's final determination." 568 U.S. at 154. The Court held that the provision did "not speak in jurisdictional terms" in part because it lacked "words with jurisdictional import" like "the mandatory word 'shall.'" *Id.* Similarly, this Court has held that "permissive, non-mandatory language such as . . . . 'may file' . . . weighs considerably against a finding that [the provision] is jurisdictional." *Merritt*, 759 F.3d at 1037.

Aside from listing a (g)(2)(C) order as one of the orders available for judicial review, § 346a(h)(1) provides no indication that the administrative process required to produce a (g)(2)(C) order is a condition of the courts' jurisdiction. The objections process itself is detailed in Section 346a(g)(2), a separate provision focused entirely on administrative processes rather than on judicial review. The Supreme Court has repeatedly found that a requirement's "appear[ance] as an entirely separate provision" from the one concerning judicial review is a significant indicator of lack of Congressional intent to make that requirement jurisdictional. *Zipes*, 455 U.S. at 393–94; *see also Reed Elsevier*, 559 U.S. at 164; *Arbaugh*, 546 U.S. at 515.

The fact that (g)(2)(C) orders issued at the conclusion of administrative objections appear on § 346a(h)(1)'s list of orders for judicial review, while (d)(4)(A) orders issued in response to petitions do not, is not in itself suggestive as to whether obtaining a (g)(2)(C) order is a jurisdictional limitation. In evaluating statutes that similarly list administrative actions available for judicial review, the Supreme Court has observed that "[t]he mere fact that some acts are made reviewable should not suffice to support an implication of exclusion as to others." *Verizon Md., Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 643 (2002). "The right to review is too important to be excluded on such slender and indeterminate evidence of legislative intent." *Abbott Labs. v. Gardner*, 387 U.S. 136, 141 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977).

The Dissent finds the language of § 346a(h)(5) suggestive of a Congressional intent to "preclude[] possible bypassing of the § 346a(g)(2) provisions." Dissent at 37. We disagree. Section 346a(h)(5) provides that "[a]ny issue as to which review is or was obtainable under this subsection shall not be the subject of judicial review under any other provision of law." This is a limitation on the availability of judicial review under *other* statutory provisions, not a pronouncement as to the internal requirements of § 346a(h)(1) jurisdiction. Similarly, *NRDC v. Johnson*, 461 F.3d 164 (2006), the Second Circuit case cited by the Dissent to support its position that § 346a(h)(5) limits this Court's jurisdiction, is inapposite. In that case, the Second Circuit held that "Section 346a(h) limits judicial review *to the courts of appeals*," rejecting an attempt by plaintiffs to challenge a tolerance by filing directly in federal *district* court under the APA, rather than filing in a federal appellate court pursuant to § 346a(h)(1). *Id.* at 173 (emphasis added). While *Johnson* also stated that § 346a(h) "forecloses such

[appellate court] review prior to the exhaustion of administrative remedies," *id.*, this was pure dictum and particularly inapposite here, since the question of whether such exhaustion was jurisdictional was not presented in that case, which expressly was concerned only with whether "decisions to leave tolerances in effect are reviewable in the district courts." *Id.* at 167.

We are also mindful what it would mean for future review of EPA decisions if we were to find obtaining a (g)(2)(C) order to be a jurisdictional requirement. In seeking to "bring some discipline" to the classification of provisions as jurisdictional, the Supreme Court has repeatedly considered how the classification of the rule in question would impact future claims. *See Auburn Reg'l Med. Ctr.*, 568 U.S. at 153–54 (examining "what it would mean" for the review process if a provision were found jurisdictional); *see also Henderson*, 562 U.S. at 434 (addressing the "considerable practical importance" that attaches to the jurisdictional label, including how jurisdictional rules "may . . . result in the waste of judicial resources and may unfairly prejudice litigants"). The impact of a jurisdictional finding must be considered within the context of the administrative process Congress was establishing in the relevant statute, and the values that process was meant to protect. For example, in *Henderson*, the Supreme Court addressed the impact of a jurisdictional finding on the process established by Congress for adjudicating veterans' benefits claims considering the "solicitude of Congress for veterans" reflected in the review scheme. *Id.*

Applying this analysis to the present case, a jurisdictional finding would mean that under no circumstances could persons obtain judicial review of a denial of a petition prior to an EPA response to an

administrative objection, even under exigent circumstances where the EPA was unwilling or unable to act. The EPA could evade judicial review simply by declining to issue a (g)(2)(c) order in response to an objection, requiring petitioners to seek writs of mandamus to order EPA action on objections. The history of this very case vividly illustrates this danger.

The language Congress used hardly suggests an intention to allow this scenario. Section 346a(g)(2) instructs the EPA to respond "as soon as practicable" to objections filed. Providing only a brief administrative review process makes sense. By the time an administrative objection is filed, the EPA has already fully considered the petition at issue and issued either a "final regulation" or, as here, "an order denying the petition." 21 U.S.C. § 346a(d)(4)(A)(iii).

Furthermore, § 346a(h)(1) provides direct access to the Courts of Appeals to challenge such EPA determinations. Broad, efficient, and prompt access to judicial review is consistent with the other values expressed by the statutory scheme: prioritizing public involvement in monitoring tolerances, as evidenced by the § 346a(d) petition process; and requiring quick EPA responses to changing scientific evidence, as evidenced by the EPA's continuing obligation to ensure that tolerances remain in compliance with the FFDCA's safety standards. *See* § 346a(b)(2)(A)(i).

We have recognized that "determining what has and what has not been exhausted . . . may prove an inexact science" and that "questions about whether administrative proceedings would be futile, or whether dismissal of a suit would be consistent with the general purposes of exhaustion, are better addressed through a fact-specific assessment of the affirmative defense than through an inquiry about whether the court has the power to decide the case at all." *Payne*,

653 F.3d at 870. Finding that a (g)(2)(C) order is a jurisdictional prerequisite would mean that courts would have no ability to analyze whether the administrative process was serving an important role in furthering the development of necessary evidence or was of little value for the issue in question, no matter the significance or the urgency of the question awaiting judicial review.

The EPA makes three main arguments that § 346a(g)(2)(C) is in fact jurisdictional. None are persuasive.

First, the EPA argues that a 1996 amendment to the language of the FFDCA's judicial review provision changing the reviewable orders listed in § 346a(h)(1), indicated a Congressional intent to condition jurisdiction over any orders not listed in Section 346a(h)(1) on their completion of the administrative appeals process. The EPA provides no support for this account of Congressional motivation, which it loosely suggests was a response to a D.C. Circuit decision from nearly a decade earlier finding that the language in the prior version did not require completing an administrative hearing process before filing for judicial review. In fact, the legislative history indicates that the amended statute "retain[ed] most of the existing provisions" regarding judicial review. H.R. Rep. No. 104-669(II), at 49 (1996). But even assuming that Congress's intent with this amendment was to have orders issued in response to petitions go through the § 346a(g)(2) administrative objections process prior to judicial review, that does not bear on the relevant question here, whether Congress intended the new rule as a claims-processing rule or a jurisdictional limitation on the courts.

Second, the EPA argues that the structure of the administrative objections process itself indicates that the process was intended as a jurisdictional requirement, rather

than a claims-processing rule. This argument relies almost entirely on the similarity between § 346a(g)(2)'s objections process and an administrative appeal process that we found jurisdictional in *Gallo Cattle Co. v. United States Department of Agriculture*, 159 F.3d 1194 (9th Cir. 1998). However, *Gallo* was premised on a view of statutory exhaustion that is inconsistent with subsequent Supreme Court precedent and later decisions in this circuit. *Compare id.* at 1197 ("[S]tatutorily-provided exhaustion requirements deprive the court of jurisdiction . . . ."), *with McBride*, 290 F.3d at 980 ("[N]ot all statutory exhaustion requirements are created equal. Only statutory exhaustion requirements containing sweeping and direct language deprive a federal court of jurisdiction."). We have specifically cautioned against reliance on prior cases like *Gallo*, "decided without the benefit of the Supreme Court's recent admonitions against profligate use of the term jurisdictional." *Merritt*, 759 F.3d at 1039. Moreover, even without this change in case law, *Gallo* would be inapposite. Unlike § 346a(h)(1), the provision evaluated in *Gallo* was explicitly jurisdictional, providing that "[t]he district courts of the United States . . . *are hereby vested with jurisdiction* to review [the administrative] ruling." *Gallo*, 159 F.3d at 1197 (emphasis added).

Finally, the EPA argues that this Court's statement in its most recent decision in the prior mandamus action forecloses this conclusion. It does not. That decision denied PANNA and the NRDC's petition for further mandamus relief because it was premised on the ground that the 2017 Order failed to meet the requirements for a final order. Rejecting that view and finding that the 2017 Order was a final denial of the 2007 Petition, this Court instructed PANNA and the NRDC that "[f]iling objections and awaiting their resolution by the EPA Administrator is a prerequisite to obtaining

judicial review of [the] EPA's final response to the petition. Only at that point may we consider the merits of [the] EPA's final agency action." *In re PANNA*, 863 F.3d at 1133. Aside from the fact that none of this language spoke to the jurisdictional issue but only to the issue of exhaustion, the instant appeal is clearly in a different posture. In compliance with our prior ruling, petitioners filed their objections, but the EPA has failed to issue a timely (g)(2)(c) order in response.

In sum, we hold that § 346a(h)(1) is not jurisdictional. It contains no jurisdictional label, is structured as a limitation on the parties rather than the courts, and only references an exhaustion process that is outlined in a separate section of the statute.

B. *Exhaustion*

Where, as here, exhaustion of administrative remedies is not jurisdictional, we "must determine whether to excuse the faulty exhaustion and reach the merits, or require the petitioner to exhaust . . . administrative remedies before proceeding in court." *Rivera v. Ashcroft*, 394 F.3d 1129, 1139 (9th Cir. 2004), *superseded by statute on other grounds as stated in Iasu v. Smith*, 511 F.3d 881, 886 (9th Cir. 2007). "In determining whether exhaustion is required, federal courts must balance the interest of the individual in retaining prompt access to a federal judicial forum against countervailing institutional interests favoring exhaustion." *McCarthy v. Madigan*, 503 U.S. 140, 146 (1992), *superseded by statute on other grounds as stated in Booth*, 532 U.S. 731.

The Supreme Court has identified the two key institutional interests favoring exhaustion as "the twin purposes of protecting administrative agency authority and

promoting judicial efficiency." *Id.* at 145. Not all cases implicate these interests to an equal degree. Exhaustion protects an agency's authority "when the action under review involves exercise of the agency's discretionary power or when the agency proceedings in question allow the agency to apply its special expertise." *Id.* Exhaustion also protects an agency's authority by providing the agency "an opportunity to correct its own mistakes with respect to the programs it administers." *Woodford v. Ngo*, 548 U.S. 81, 89 (2006). "[E]xhaustion principles apply with special force when frequent and deliberate flouting of administrative processes could weaken an agency's effectiveness by encouraging disregard of its procedures." *McCarthy*, 503 U.S. at 145.

The institutional interest in requiring exhaustion to protect agency authority appears particularly weak in the present case. The challenged action, permitting the use of chlorpyrifos on food products, does not involve exercise of the EPA's general discretion, but must take place in compliance with strict statutory directives. The questions presented in this appeal are in no way factual or procedural questions implicating the agency's "special expertise." This is not a situation, for example, where the EPA determined a pesticide was safe and the science underlying that determination is challenged. Rather, the purely legal questions here concern the statutory requirements of the FFDCA, and, accordingly, are suited to judicial determination. The crux of petitioners' challenge is that the EPA has found that chlorpyrifos is not safe and therefore cannot maintain a tolerance for it.

Allowing the petition to proceed would not reward failure to properly exhaust administrative remedies. "Proper exhaustion demands compliance with an agency's deadlines

and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Woodford*, 548 U.S. at 90–91.

Here, petitioners timely submitted objections to the order denying the 2007 petition to revoke tolerances, fulfilling all of their exhaustion obligations except for the one not within their control—obtaining the EPA's response to the objections. Petitioners' objections were filed 13 months ago, and the key issue therein—whether the EPA was statutorily obligated to revoke the tolerance for chlorpyrifos—was first raised to the EPA over a decade ago in the 2007 Petition. This timeline has provided the EPA more than ample opportunity to correct any mistakes on its own. But, despite the statutory requirement that the EPA respond to the objections "as soon as practicable," it has failed to do so. The history of this litigation supports the inference that the EPA is engaging in yet more delay tactics to avoid our reaching the merits of the sole statutory issue raised here: whether chlorpyrifos must be banned from use on food products because the EPA has not determined that there is a "reasonable certainty" that no harm will result from its use, even under the established tolerances.

The second institutional interest identified by the Supreme Court as potentially favoring exhaustion, judicial economy, counsels against requiring further administrative exhaustion in this instance. Exhaustion offers the greatest support for judicial efficiency where it either permits the agency to "correct its own errors" such that the "judicial controversy may well be mooted, or at least piecemeal appeals may be avoided," or where administrative review "may produce a useful record for subsequent judicial consideration, especially in a complex or technical factual

context." *McCarthy*, 503 U.S. at 145. Here, it is just the opposite. Since 2012, we have issued five separate decisions related to the EPA's inaction on the chlorpyrifos tolerances. Declining to waive exhaustion at this point would make this our sixth decision on the matter without once reaching the merits, setting the stage for yet another "piecemeal appeal[]" if the EPA should someday issue a response to the petitioners' objection—something the EPA itself has strongly hinted may not come about until 2022, if then. Similarly, further development of the administrative record is of no use to judicial efficiency at this point in the proceedings; there are no factual questions, let alone "complex or technical" ones, at issue—only legal questions. And on the merits of these legal questions, the EPA offers no defense of its inaction, effectively conceding its lawlessness.

While both institutional interests favoring exhaustion are weak, this petition invokes two of the "three broad sets of circumstances in which the interests of the individual weigh heavily against requiring administrative exhaustion." *McCarthy*, 503 U.S. at 146. First, the Supreme Court has recognized that exhaustion may be excused where "requiring resort to the administrative remedy may occasion undue prejudice to subsequent assertion of a court action. Such prejudice may result, for example, from an unreasonable or indefinite timeframe for administrative action." *Id.* at 146–47. Most often, an administrative remedy is deemed inadequate "because of delay by the agency." *Id.* Here, the EPA's expressed intent to withhold action for years to come is "unreasonable" as applied here, especially as petitioners' objections concern no factual issues that would require additional time to investigate. The EPA has had over a year to respond to the objections already, with no result.

In *Coit Independence Joint Venture v. Federal Savings & Loan Insurance*, 489 U.S. 561, 586–87 (1989), the Supreme Court held that a claimant was not required to wait for a decision on its administrative appeal before seeking judicial review where the administrative appeal had been pending for over 13 months as of the date of oral argument, and there was no "clear and reasonable time limit on [the agency's] consideration of . . . claims." *See also Smith v. Ill. Bell Tel. Co.*, 270 U.S. 587, 591–92 (1926) (holding that a claimant "is not required indefinitely to await a decision of the [administrative] tribunal before applying to a federal court for equitable relief"). Like the regulation evaluated in *Coit*, the EPA's interpretation of the FFDCA's administrative review provision as providing limitless time to respond to objections would give the agency "virtually unlimited discretion to bury large claims like [petitioners'] in the administrative process, and to stay judicial proceedings for an unconscionably long period of time." *Coit*, 489 U.S. at 586. The delay is particularly prejudicial here where the continued use of chlorpyrifos is associated with severe and irreversible health effects. *See Bowen v. City of New York*, 476 U.S. 467, 483 (1986) (concluding that disability-benefit claimants "would be irreparably injured were the exhaustion requirement now enforced against them"); *Aircraft & Diesel Equip. Corp. v. Hirsch*, 331 U.S. 752, 773 (1947) (directing consideration of "irreparable injury flowing from delay incident to following the prescribed procedure" in determining whether to require exhaustion). Petitioners have been waiting over a year for EPA action on their objections, and over eleven years for an EPA decision on chlorpyrifos tolerances, while being

continually exposed to the chemical's effects. This is a sufficient basis to waive or otherwise excuse exhaustion.[2]

In light of the strong individual interests against requiring exhaustion and weak institutional interests in favor of it, we conclude that petitioners need not exhaust their administrative objections and are not precluded from raising before us the issues at hand on the merits.[3]

## C. *The Merits*

We now turn to the merits. Petitioners argue that the EPA's decision in its 2017 order to maintain a tolerance for chlorpyrifos in the face of scientific evidence that its residue on food causes neurodevelopmental damage to children is flatly inconsistent with the FFDCA. Specifically, petitioners argue that a need for additional scientific research is not a valid ground for maintaining a tolerance that, after nearly two decades of studies, has not been determined safe to "a reasonable certainty," and that the EPA cannot delay a decision on tolerances to coordinate that decision with registration review under FIFRA.

The EPA presents no arguments in defense of its decision. Accordingly, the EPA has forfeited any merits-

---

[2] Exhaustion may also be excused where "the administrative body is shown to be biased or has otherwise predetermined the issue before it." *McCarthy*, 503 U.S. at 148. The history detailed above strongly suggests that the EPA, for whatever reason, has decided not to ban chlorpyrifos under any circumstances, even when its own internal studies show that it could not possibly make the factual findings necessary to avoid a ban.

[3] Because we find judicial review available under § 346a(h)(1), we will not address petitioners' alternative argument that judicial review is available under FIFRA, 7 U.S.C. § 136n(b).

based argument. *See Martinez v. Sessions*, 873 F.3d 655, 660 (9th Cir. 2017).

The FFDCA states unequivocally that the Administrator "shall modify or revoke a tolerance if the Administrator determines it is not safe." § 346a(b)(2)(A)(i). A tolerance is safe when "the Administrator has determined that there is a *reasonable certainty* that *no* harm will result from aggregate exposure to the pesticide, including all anticipated dietary exposures and all other exposures for which there is reliable information." § 346a(b)(2)(A)(ii) (emphasis added). Accordingly, the EPA bears a continuing obligation to revoke tolerances that it can no longer find with a "reasonable certainty" are safe.

The EPA's 2016 risk assessment concluded that its analysis of chlorpyrifos "continues to indicate that the risk from potential aggregate exposure does not meet the FFDCA safety standard" and that "expected residues of chlorpyrifos on most individual food crops exceed the 'reasonable certainty of no harm' safety standard." This finding was the EPA's final safety determination before the 2017 EPA Order. The 2017 Order declined to revoke chlorpyrifos tolerances but did not make a finding of reasonable certainty that the tolerances were safe. Instead, it found "significant uncertainty" as to the health effects of chlorpyrifos, which is at odds with a finding of "reasonable certainty" of safety under § 346a(b)(2)(A)(ii) and therefore mandates revoking the tolerance under § 346a(b)(2)(A)(i).

"[H]owever desirable it may be for [the] EPA to consult [a Scientific Advisory Board] and even to revise its conclusion in the future, that is no reason for acting against its own science findings in the meantime." *Chlorine Chemistry Council v. EPA*, 206 F.3d 1286, 1290 (D.C. Cir. 2000). The EPA cannot refuse to act "because of the

possibility of contradiction in the future by evidence unavailable at the time of action – a possibility that will *always* be present." *Id.* at 1290–91 (emphasis in original). Chlorpyrifos similarly does not meet the statutory requirement for registration under FIFRA, which incorporates the FFDCA's safety standard. As we have previously counseled, "evidence may be imperfect [and] the feasibility inquiry is formidable," but there remains no justification for the "EPA's continued failure to respond to the pressing health concerns presented by chlorpyrifos," which has now placed the agency in direct contravention of the FFDCA and FIFRA. *In re PANNA*, 840 F.3d at 105.

Accordingly, we **GRANT** the petition for review. The EPA's 2017 Order maintaining chlorpyrifos is **VACATED**, and the case is remanded to the EPA with directions to revoke all tolerances and cancel all registrations for chlorpyrifos within 60 days.

---

FERNANDEZ, Circuit Judge, dissenting:

League of United Latin American Citizens, Pesticide Action Network North America (PANNA), Natural Resources Defense Council (NRDC), California Rural Legal Assistance Foundation, Farmworkers Association of Florida, Farmworker Justice GreenLatinos, Labor Council for Latin American Advancement, Learning Disabilities Association of America, National Hispanic Medical Association, Pineros Y Campesinos Unidos del Noroeste, and United Farm Workers (collectively, "LULAC") petition for review of the Environmental Protection Agency's (EPA) 2017 order denying a 2007 petition to revoke all tolerances for the pesticide chlorpyrifos (hereafter "the Pesticide"). *See* Chlorpyrifos; Order Denying PANNA and NRDC's Petition

to Revoke Tolerances, 82 Fed. Reg. 16,581, 16,583 (Apr. 5, 2017) (the "2017 Order").[1]  In the briefs (not in the petition for review), LULAC and the States ask for a writ of mandamus ordering EPA to respond to the objections they filed to the 2017 Order.  In their brief, the States also ask for a writ of mandamus compelling the EPA to issue a final rule revoking chlorpyrifos tolerances.

The EPA regulates the use of pesticides on food pursuant to the Federal Food, Drug, and Cosmetic Act[2] (FFDCA) and the Federal Insecticide, Fungicide and Rodenticide Act (FIFRA).[3]  At present, the Pesticide is registered as an insecticide for food crops and non-food settings.  In the view of LULAC and the States, the Pesticide is unsafe[4] and the EPA should modify or revoke the tolerances it has established for the Pesticide pursuant to FFDCA.  *See* 21 U.S.C. § 346a(a)(1)(A), (b)(1).  For that matter, they believe that the EPA should cancel the Pesticide's registration for food crops under FIFRA.  *See* 7 U.S.C. § 136a(g)(1)(A)(v).  In September 2007, PANNA and NRDC filed an administrative petition with the EPA seeking revocation of the Pesticide's FFDCA food tolerances and cancellation of its FIFRA registrations (the 2007 Petition).  On April 5, 2017, the EPA issued the 2017 Order in which it denied the 2007 Petition.  *See* 82 Fed. Reg. at 16,581.

---

[1] The States of New York, Maryland, Vermont, Washington, California, and Hawaii, as well as the Commonwealth of Massachusetts and the District of Columbia (collectively, "the States"), are Intervenors in support of LULAC's petition.

[2] 21 U.S.C. §§ 301–399g.

[3] 7 U.S.C. §§ 136–136y.

[4] *See* 21 U.S.C. § 346a(a)(1).

LULAC and certain states filed objections to the 2017 Order on June 5, 2017, and on that same date, LULAC filed the instant petition for review of the merits of the 2017 Order.

## JURISDICTION

The majority holds that we have jurisdiction over the petition for review. I disagree. Of course, we do have jurisdiction to determine whether we have jurisdiction over the petition for review. *See Special Invs. Inc. v. Aero Air Inc.*, 360 F.3d 989, 992 (9th Cir. 2004). Nonetheless, "'[w]e presume that federal courts lack jurisdiction unless the contrary appears affirmatively from the record.'" *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 n.3, 126 S. Ct. 1854, 1861 n.3, 164 L. Ed. 2d 589 (2006). Thus, "the party asserting federal jurisdiction . . . has the burden of establishing it." *Id.* Here LULAC[5] attempts to meet that burden by pointing to the judicial review provisions of FFDCA. *See* 21 U.S.C. § 346a(h).[6] It also relies on FIFRA. *See* 7 U.S.C. § 136n(b). The States also point to 5 U.S.C. §§ 704, 706 as a possible source of jurisdiction. In my view, all of those attempts fail. Hence I would dismiss the petition.

### A. Jurisdiction Under FFDCA

The 2017 Order was issued pursuant to § 346a(d)(4)(A)(iii). In seeking to obtain FFDCA jurisdiction, LULAC relies upon § 346a(h)(1) which, as pertinent here, provides that:

---

[5] What I determine hereafter regarding LULAC also applies to the States unless otherwise indicated.

[6] Hereafter, all references to § 346a are to 21 U.S.C. § 346a.

> In a case of actual controversy as to the validity of . . . any order issued under subsection . . . (g)(2)(C) [of this section], . . . any person who will be adversely affected by such order . . . may obtain judicial review by filing in the United States Court of Appeals for the circuit wherein that person resides or has its principal place of business . . . a petition praying that the order . . . be set aside in whole or in part.

Unfortunately for LULAC's argument, the subsection referred to in the above quotation from § 346a(h)(1) is the subsection that provides for the EPA to issue an order following objections to a previous order of the EPA and that agency's processing of those objections. *See* § 346a(g)(2). That, by the way, is the process to which we pointed the parties in our earlier consideration of the EPA's proceedings regarding the Pesticide and stated that only after the review was completed "may we consider the merits of EPA's 'final agency action.'" *Nat. Res. Def. Council, Inc. v. U.S. EPA (In re PANNA)*, 863 F.3d 1131, 1133 (9th Cir. 2017). Specifically, § 346a(g)(2)(A) provides that a person may file objections to an order issued under § 346a(d)(4), as the 2017 Order was. The EPA may then hold a public evidentiary hearing upon request or upon its own initiative. *See* § 346a(g)(2)(B). An appropriate "order stating the action taken upon each such objection and setting forth any revision to the . . . prior order" must then be issued. *Id.* at (C). Pursuant to the plain reading of the above subsection taken

as a whole,[7] then, and only then, can judicial review in this court be sought pursuant to § 346a(h)(1).

But, says LULAC, the requirement is no more than a claim-processing rule[8] rather than a true jurisdictional rule.[9] The majority agrees; I am not convinced. Here Congress was very careful and very specific about the class of cases— the limited kind of orders—over which it wished to give the courts of appeals direct review. It made it plain that we could not review the EPA's actions in this specific area until the agency had developed and considered a full record regarding objections and the like. Before that occurred, judicial review was not available; we had no authority whatsoever to consider the issue. As the Second Circuit Court of Appeals has pointed out, § 346a(h)(1) is "unique in that it only commits certain specific agency actions to appellate court review." *Nat. Res. Def. Council v. Johnson*, 461 F.3d 164, 172 (2d Cir. 2006). In light of that careful restriction on judicial review, it is not at all likely that Congress would

---

[7] *See Nuclear Info. & Res. Serv. v. U.S. Dep't of Transp. Research & Special Programs Admin.*, 457 F.3d 956, 960 (9th Cir. 2006).

[8] *See Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 435, 131 S. Ct. 1197, 1203, 179 L. Ed. 2d 159 (2011) (claim-processing rules merely "seek to promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times").

[9] "'Jurisdiction' refers to 'a court's adjudicatory authority.'" *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 160, 130 S. Ct. 1237, 1243, 176 L. Ed. 2d 18 (2010). "Accordingly, the term 'jurisdictional' properly applies only to 'prescriptions delineating the classes of cases (subject-matter jurisdiction) . . .' implicating that authority." *Id.* at 160–61, 13 S. Ct. at 1243; *see also Payne v. Peninsula Sch. Dist.*, 653 F.3d 863, 868 (9th Cir. 2011) (en banc), *overruled on other grounds by Albino v. Baca*, 747 F.3d 1162, 1171 (9th Cir. 2014) (en banc).

have authorized our seizing jurisdiction before the specific agency action was concluded. Lest there be any doubt, Congress also precluded possible bypassing of the § 346a(g)(2) provisions when it directed that no "judicial review under any other provision of law" would be permitted. Section 346a(h)(5); *see also Johnson*, 461 F.3d at 172–74. And that is further emphasized by the fact that the section does not speak in general language of finality or exhaustion;[10] it, rather, states specifically when we can assume review authority over the particular matters. Had Congress contemplated appellate court review before the EPA completed the process required by § 346a(g)(2)(C), it could easily have inserted orders under § 346a(d)(4), or, more specifically, § 346a(d)(4)(A)(iii) into the judicial review provisions of § 346a(h)(1), which, of course, it did not do. Rather, it expressly allowed judicial review only over the agency's ruling on objections that had to be filed with the agency, and not before. *See Gallo Cattle Co. v. U.S. Dep't of Agric.*, 159 F.3d 1194, 1197–98 (9th Cir. 1998); *see also McBride Cotton & Cattle Corp. v. Veneman*, 290 F.3d 973, 979–80 (9th Cir. 2002) (discussing *Gallo Cattle*). That is particularly telling because earlier iterations of the review provisions contained no such jurisdictional limitations. *See Nat'l Coal. Against the Misuse of Pesticides v. Thomas*, 809 F.2d 875, 878–79 (D.C. Cir. 1987).

In short, I see no basis for deconstructing that carefully constructed jurisdictional scheme and thereby inviting

---

[10] *Cf. Anderson v. Babbitt*, 230 F.3d 1158, 1162 (9th Cir. 2000); *Rumbles v. Hill*, 182 F.3d 1064, 1067 (9th Cir. 1999).

premature attacks on matters committed to the expertise of the agency in the first instance.**11**

### B. Jurisdiction under FIFRA

LULAC then argues that because it not only asked for the EPA to revoke all tolerances for the Pesticide but also asked the EPA to cancel all registrations for the Pesticide, the 2007 Petition to the EPA arose under both the FFDCA and FIFRA. Thus, it argues, it need not abide by the FFDCA review provisions, but can rely on the jurisdictional provisions of the FIFRA to establish our jurisdiction. *See* 7 U.S.C. § 136n(b). I do not agree.

Rather, I am persuaded by the cogent reasoning of the Second Circuit Court of Appeals in a strongly similar situation. *See Johnson*, 461 F.3d at 176. In that case, pursuant to the FFDCA provisions, NRDC also challenged the EPA's setting of tolerances for residues on food of five pesticides (not including the Pesticide). *Id.* at 169–70. NRDC added that their registration should be cancelled pursuant to FIFRA. *Id.* at 176. NRDC had brought its action in the district court, and on appeal the Second Circuit determined that the district court did not have jurisdiction to review the EPA determination under the FFDCA because, as § 346(a)(h)(1), (5) provide, jurisdiction over those claims was limited to the courts of appeals. *Id.* at 172–76. NRDC

---

**11** Because the completion of the administrative process is jurisdictional, I do not consider LULAC's fallback argument that it would be futile to pursue the prescribed process. *See Sun v. Ashcroft*, 370 F.3d 932, 941 (9th Cir. 2004); *see also Ross v. Blake*, __ U.S. __, __, 136 S. Ct. 1850, 1857, 195 L. Ed. 2d 117 (2016); *Gallo Cattle*, 159 F.3d at 1197.

then argued that the district court still had jurisdiction pursuant to FIFRA. The court replied:

> However, FIFRA's grant of jurisdiction to the district courts is irrelevant. The NRDC Appellants "challenge the registration of pesticides under FIFRA only through their challenge to the tolerances set under the [F]FDCA." Essentially, therefore, the violations of FIFRA alleged by the NRDC Appellants "amount to challenges to the methodologies used in reaching the reassessment determinations at issue" in this case. As such, these challenges represent an "issue as to which review is or was obtainable under Section 346a(h). Section 346a(h)(5) precludes judicial review of these issues "under any other provision of law." The NRDC Appellants' attempt to find independent jurisdiction for their claims under FIFRA is thus precluded by the express language of § 346a(h)(5). The NRDC Appellants' claims are reviewable only in the courts of appeals, and only after they have exhausted the statutory provisions for administrative review.

*Id.* at 176 (citations omitted).

I accept that reasoning and the same reasoning should apply here. It would foreclose LULAC's argument. LULAC essentially argues that the EPA has erred in maintaining tolerances for the Pesticide, which is an unsafe insecticide, and for that same reason it argues that the EPA must forthwith revoke registration of the Pesticide. It argues

that it should not have to wait for the EPA to rule on its registration claim, but that is just an allotrope of its central arguments against waiting for relief under the FFDCA tolerances provision with which its FIFRA argument is "inextricably intertwined." *See Ctr. for Biological Diversity v. U.S. EPA*, 847 F.3d 1075, 1089 (9th Cir. 2017). Therefore, the FIFRA provision does not offer a way to avoid the judicial review provisions of the FFDCA in this instance.

Thus, I would dismiss the petition for review for lack of jurisdiction.[12]

## WRIT OF MANDAMUS

In its briefs, LULAC asks us to issue a writ of mandamus[13] directing that the EPA respond to its objections within sixty days. However, LULAC did not file a petition for issuance of that writ and, therefore, made no attempt to comply with the Federal Rules of Appellate Procedure when it filed its petition for review of the merits of the 2017 Order. *See* Fed. R. App. P. 21(a), (c); *see also* Fed. R. App. P. 20. I see no reason to treat LULAC's petition for review as, in fact, one for a writ of mandamus. It was not, and could not have been, a mere instance of mislabeling a request for relief that was sought. Had LULAC intended to seek a writ of

---

[12] I do not overlook the States' argument regarding 5 U.S.C. §§ 704, 706 (the Administrative Procedure Act provisions). But those provisions do not confer direct review jurisdiction upon this court. *See Gallo Cattle*, 159 F.3d at 1198; *see also Califano v. Sanders*, 430 U.S. 99, 106–07, 97 S. Ct. 980, 985, 51 L. Ed. 2d 192 (1977). Therefore, they add nothing of substance to the petition for review issues now before us.

[13] *See* 28 U.S.C. § 1651(a); *see also Cal. Cmtys. Against Toxics v. U.S. EPA (In re A Cmty. Voice)*, 878 F.3d 779, 783 (9th Cir. 2017).

mandamus, rather than a merits review, that would have been most peculiar because on that same day LULAC had just filed its objections to the 2017 Order. It could not honestly complain about delay in considering its objections at that point. Were I to decide otherwise, I would essentially ignore our holding, which was handed down after this petition for review was filed, but before the briefs were filed, and which declared that PANNA and NRDC must file their objections and await resolution of those objections by the EPA before we would consider the merits of the EPA's actions regarding the Pesticide. *See Nat. Res. Def. Council*, 863 F.3d at 1133.

Thus, this case is quite unlike cases where we decided that a party improperly sought to appeal an interim procedural order rather than a decision on the merits of a case, but we also considered whether we should construe the appeal as a petition for a writ of mandamus. *See Kum Tat Ltd. v. Linden Ox Pasture*, *LLC*, 845 F.3d 979, 983 (9th Cir. 2017) (discussing order denying arbitration request); *Johnson v. Consumerinfo.com, Inc.*, 745 F.3d 1019, 1023 & n.2 (9th Cir. 2014) (discussing order compelling arbitration and staying judicial proceedings); *see also United States v. Davis*, 953 F.2d 1482, 1497–98 (10th Cir. 1992) (dismissing request for mandamus by defense counsel in criminal conviction appeal where no petition had been filed); *EEOC v. Neches Butane Prods. Co.*, 704 F.2d 144, 146, 151–52 (5th Cir. 1983) (denying request that an appeal from a stay of proceedings pending compliance with discovery orders be treated as a mandamus petition where requesting party was represented by competent counsel and should have filed a petition therefor); *Jones & Guerrero Co., Inc. v. Sealift Pac.*, 650 F.2d 1072, 1073–74 (9th Cir. 1981) (per curiam) (refusing to construe appeal from order remanding case to

Guam Superior Court as a petition for mandamus where no mandamus petition filed).

In short, I would decline to treat LULAC's petition as one for a writ of mandamus. Of course, I express no opinion on whether or when LULAC can or should file a petition for a writ of mandamus because LULAC deems the EPA's consideration of the objections to have been unduly delayed. *See PANNA v. U.S. EPA (In re PANNA)*, 798 F.3d 809, 813 (9th Cir. 2015); *Telecomms. Research & Action Ctr. v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984).

Thus, I respectfully dissent from parts A and B of the Discussion in the majority opinion. As a result, I do not decide the issue in part C although I do find the discussion therein does have some persuasive value.